And we are ready to hear argument when you are ready to present it. Thank you, Your Honor. Good morning. May it please the Court. Bridget Acy for Plaintiff Appellants. I've asked to reserve four minutes for rebuttal. I'd also like to very much thank the Court and the Court staff for accommodating my illness and last-minute inability to be there in person. Not a problem. I'd like to first address why the District Court erred in granting the plaintiff the summary judgment on our claim for equitable relief based on defendant's failure to disclose. And I'd like to start with the key facts that underpin that claim. Class members here were switched from a defined contribution plan to a new pension plan effective in 1985. They were cashed out of the prior plan with a lump sum, and the new pension plan said they would get credit both for the years that they worked prior to 1985 and for the years they worked after 1985. The plan also said that their pensions would be reduced by an offset for the lump sum that they got in a specific amount listed next to their name in Appendix J to the plan. It is undisputed that defendants never created a version of Appendix J that listed offset amounts for the members of the class. It's also undisputed that for the next 30 years, the disclosures that defendants claimed to have provided, the disclosures required by ERISA, never said that this lump sum would be appreciated forward to a hypothetical future value, never disclosed that that appreciation would use an 8.5% interest rate, and always included examples of pensions reduced by no more than 8.5%. But what defendants actually did was use a phantom 8.5% interest rate to calculate the offsets, and that calculation left a full quarter of the class members with no pension at all. Counsel, how large is the class? What is the approximate number of class members? It's somewhere over 1,000. I'm sorry, Your Honor, but I don't have that number. I was looking for an order of magnitude, whether it was 50 or 5 million, so 1,000 is an approximation I gather. Yes, Your Honor, and a full quarter of the class members were left with no pension at all, even those that worked a decade or more after the transition, and over half received a smaller pension than if their pensions were simply calculated based on credit for years they worked, starting in 1985. That is, put another way, long-term employees were treated worse than if they had been newly hired in 1985. This conduct is a textbook violation of ERISA. Defendants' misleading disclosures should be remedied under Section 1132A3 of ERISA. The district court here dismissed that claim on summary judgment, holding it was time-barred. It is not time-barred. The statute of limitations for this claim, under Section 1113 of ERISA, runs six years after the date of the last act that constitutes part of the violation or the breach. My understanding, just forgive me for interrupting, my understanding is that the parties agreed to that, that it's a six-year statute of limitations period, is that right? Is that your understanding? It is my understanding that both parties agree that this is the statute of limitations. Okay, go right ahead. Here defendants misrepresented and failed to disclose the true impact of the offset, beginning with the 1985 summary plan description and in every required summary plan description that followed from 1993 to 2014. The description of the offset in the summary plan descriptions from 1993 to 2014, the later SPDs, are all almost identical, they're very similar. And the complete description of the offset in those summary plan descriptions is the following. The monthly benefit of the other plan will be subtracted from the benefit value under this plan. And then there's an example given that if you had an $800 pension and a $200 offset, again a 25% example, that would be the reduction. Counsel, I have another question for you. I'm sorry again to interrupt the flow, but if we agree with you that the statute of limitations is met, that the claim is timely, is it your position that we have the authority to go ahead and decide the equitable claim here?  Yes, Your Honor. So below, the plaintiffs move for summary judgment on the merits of this claim on liability. So we do believe that the record is sufficient for the court if the court wishes to reach the merits after deciding the statute of limitations issue, the court could do so. The court could, in the alternative, remand for the district court to do so in the first instance. I think either option is open. Would your clients also be open to mediation in that event? Yes, Your Honor. You were saying that there was a failure to disclose and you said for the next 30 years and then you gave, you sort of went from there. I'm looking back at this ER 946, which is this email dated March 22nd, 1996, it's discussed extensively in the briefing, this is the ticking time bomb email, is this the first indication in your timeline of when the defendants internally knew about this problem? It's certainly the clearest evidence of an internal document showing that the defendants fully understood the impact of the offset. As of 1996? That's as of 1996. Okay, and then was it 2002 when there was a change in the interest rate? They cut off the interest rate prospectively. I'm paraphrasing the trial testimony, I'm not doing a good job, but you know the case very well. Was that 2002? It's in 2002 that Northrop amended the plan to change the way that the offset was calculated only if you were still a current employee at Northrop, so it did not benefit people like Ms. Mollejo. I understand. I'm just looking for the year, ma'am. I understand. It's 2002? Yes, Your Honor. Okay, so my question really, and forgive me for being clumsy about getting to it, but my question is between 1996 and 2002, were there other disclosures made to members of the plan about this reduction being calculated at 8.5%? So Your Honor, in terms of the disclosures that were made, the summary plan descriptions were issued in 1993, 1996, 1999. Okay, but if I've read those, and I've read all of them, and if my view is that that wouldn't have put me on notice, I'm trying to figure out. This is a very overt statement yet at ER 946, and then in 2002 there was a statement that I would constitute certainly a much more overt action. So for purposes of disclosure, I'm trying to figure out if there's anything else in between other than the summary plan descriptions that we have here in the record. And if I'm understanding Your Honor's question correctly, if the question is whether defendants gave other disclosures to plan members? That's a better way of asking my question, yes. Defendants have not, to my knowledge, defendants have not identified any summary plan description or similar disclosure that ever identified the interest rate or recognized the problem with Appendix J or any of the other issues that we argue here. The documents that Your Honor is referring to regarding the 1996 emails, those were internal documents at Northrop that showed that what they did were not distributed. No, I appreciate that. Thank you for, you've answered my question. Thank you, Your Honor. If anything, these later descriptions after 1985 are actually worse in some ways, in many ways than the 1985 description. It's even more summary. And again, no explanation of how this offset is actually going to impact the tensions of the class members. Because that 2014 summary plan description constitutes part of the violation, it's well within the six-year statute of limitations. We filed suit in February of 2017. Again, the district court granted summary judgment on this. It's our position that the summary judgment record was clear, that this claim was timely. Certainly at a minimum, it would have had to be tried. It's not possible to read this record and hold the claim untimely as a matter of law. We would also argue, although the court doesn't need to reach this, that the evidence was also sufficient to warrant trial on, to at least warrant trial on the application of the Fraud or Concealment Discovery Rule, which is another provision of Section 1113. If there's sufficient evidence of concealment by defendants, the statute... What is your best evidence of concealment? So certainly the 1996 internal documents showing that Northrop understood that the offset was eviscerating pensions and that the interest rate was outrunning the benefits that plan members were earning, coupled with its obligation to disclose the terms of the plan consistent with ERISA in the summary plan description, the fact that it is not doing so after it has that knowledge, I think is clear evidence of concealment. The defendants also concealed the failure to ever create Appendix J. That was never disclosed to plan members until discovery in this case. It was concealed by amending the plan a few years later to simply remove the reference to Appendix J, still without putting in any, at that point in 1989, any formula for the offset. There's a number of communications in the record that went to specific plaintiffs, and they're dated differently, you know, of course, but these are aimed at individual defendants. So the one I'm looking at now is at ER 1004, the letter dated June 3rd, 1992, to Mr. Roberts. I don't know if you're in a place where you can put your hands on that, but I'm going to have the same question for opposing counsel, you know, walk me through and explain where does this explain, where does this disclose? And your Honor said 1104, did I hear that correctly? You did. But there's quite a number of them, so if you've got another one, I can turn to another one, but this is at ER 1004? I think it's 1004, not 1004. I have that now. Apologies for the delay. Did I say 1004? Mm-hmm. Did I misspeak? Okay. No. Counsel had said it before. I missed it. Apologies. No problem. So my question is going to be in this, looking at this 100456. I'll just tell you so you have the benefit of responding. I struggle to see how this would have put me on notice, but I'm going to ask opposing counsel to walk me through it, and I'm going to give you the same chance here, because your argument is that there was active concealment, or at least that's one of your arguments. So if I had been Mr. James Roberts, what does this tell me? I think that this tells you that you're going to receive a pension from the plan that does not clearly put you on notice of an offset that's going to reduce that pension. So these calculations for these people, individual people, they knew the date of birth, of course, and they knew how long they had been working, and these are projecting out to, I mean, one unknown is when someone was going to retire. So these are projected out, I think, typically to age 55 or 65 retirement date. This one looks like this person was 55 years old, and they're projecting out to age 65. Right? That's correct. Yes. Where does – okay, so on page ER1006, there's early retirement factor. Do you see that? I do, Your Honor. How do you interpret this, the benefit formula? I mean, pieces of it – I'll be honest, pieces of it, I can interpret the early retirement factor. I think I am – 0.4810. I'm struggling with what that means, if this person is retiring early. If they are – if this is an estimate of them retiring early, then I think that is indicating that there's some percentage reduction to the benefit for the number of years. But that's just referring – your guess is that that's referring to if this person does not work to 65. Correct. Yes, there were, under various versions of the plan, early retirement options. Okay. And then, as you see at ER1007, January 1, 1989 formula, prior plan formula. Yes, correct, Your Honor. Does this help put the individual on notice that there was going to be this offset? Particularly in the lower part of the page, it talks about TRW benefit after offset. I think that the Social Security – you know, one thing that's confusing in this is that there are both – there's a Social Security offset, there is – The Social Security – Also – Oh, go ahead. There's also a prior plan benefit. There's – you know, again, they're providing two different formulas on this page without being clear which formula is going to apply. So, again, I think these documents, even if buried in here, there might be a reference to a prior plan, are extremely confusing. And there's no evidence that these went to class members generally. And there's significant evidence. For example, I would point to ER1034, which is a letter that was sent to Plaintiff Fred Hermosa, and that record shows us on the day of his deposition in this case, telling him he was eligible to receive an unreduced vested pension benefit, which, of course, he was never – he had been told many times by Northrop that he could not. Was there ever any – we have that in our pleadings here – I mean, in our briefs. Was there ever any explanation or correction or whatever came of that? By that point, the case was already in litigation. You know, Northrop has never given Mr. Hermosa, who worked for them for 20 years, including 13 years after the plan transition, a penny of pension benefits. Well, I guess what I was trying to get at was more mundane. I'm trying to figure out, is it – do I correctly understand that this letter appeared on the day of his deposition and then there was no – from what we can tell, there's no follow-up, there's no explanation, it just appeared on the day of his deposition? Yes, Your Honor. That's correct. This was the information he was giving on the date of his deposition. All right. And Mr. Beleha also testified, and this letter is in the record, that a year before he applied for benefits in 2015 – this is at ER-128 – he was told he'd earned a monthly benefit of $1,066.80. All right. You wanted to save time, and I've taken you – Let me ask one – Oh, go right ahead. Go right ahead. Just one question. Counsel, in your practice, I guess I'm not asking whether it's common, but have you had – run into other cases where, in this kind of situation, the performance of the earlier hypothetical plan distributions outrun and overwhelm the current plan? So, you know, so you end up with a zero pension? Is that common? I don't believe it's common, Your Honor. This is, for me personally, the first case of its kind that I have litigated. And again, that fact is not only – has not only harmed these individuals, but they were never told that this offset could outrun the benefits that they would earn after the plan transition. And for that reason, we would ask the court to reverse both of the rulings. Well, you think ERISA requires that kind of a warning to be given, you know, in order for there to be full disclosure? Absolutely, Your Honor. The disclosure requirements under ERISA require that the disclosure be comprehensive, accurate, calculated to be understood, requires examples if those are necessary to be understood, requires that reductions and offsets not be obscured or minimized. And here, defendants' disclosures failed every one of those tests. There's no way that those put the plan participants on notice of the impact that this offset would have on their pensions. Thank you. Thank you. I think we're done at this point? Not at the moment. All right. For planning purposes, when you come back, we've taken you over. We'll put four minutes on the clock when you come back. Thank you. You're welcome. We'll hear from opposing counsel. This is an important case. We'll take as much time as we need. Oh, thank you. Thank you. So don't feel like you need to rush. Let me just have a moment, Your Honors, to make some organization out of my mess of paperwork. I'm Will Phillips. I'm from Covington & Burling, and I represent the appellants here. There's some misperceptions that are going on, which I'd just first like to start. My colleague misdescribes the very first disclosure made about this offset. She reads half of it, but she doesn't read the other half. If I may read the other half, in that 1985 SPD, it not only talks about the ESL account balance, which will be used to serve to reduce the amount of the benefit, it goes on to say, if the annuity value of the ESL account balance exceeds the amount produced by the TRW plan's user, there will be no further benefit from the plan. That statement is repeated in lots of disclosures at the time. So what do we make of the individual letters that went to folks to say, you can expect to receive? What about that? I'm going to come to those. That's a very good question. Would you come to it? Please. And I'd like to come to them. If Your Honor will give me just a little leave, I want to answer a couple of other questions and then come to that, if I may. Fine. Both sides' experts testify that this kind of offset, this kind of plan, was very common in the 1980s. It was a common thing to do. The biggest misimpression I want to correct about those things is that this is not a plan where there is an increasing amount that eats away your pension. That's not true. What happened here, there was an amount of an offset set in 1985. It was determined by taking the actuarial equivalent on a bunch of assumptions. And there was an Appendix J set that gave the actual amount. That never was prepared, as I understand it. Is that correct? Ma'am, I'm sorry, Your Honor. Was there an Appendix J ever produced? Yes. There was an Appendix J that listed all the microwave employees and listed the exact amount of the offset that would not change. It should have been done. It should have been done also for the ESL employees, but because of the ESL employees. That's who we're concerned with here is the ESL employees. Was there an Appendix that listed the ESL employees and the amount that is at issue? No. But the amount was determinable just like the microwave employees was determinable. It was fixed in 1985. It was exactly fixed in 1985. The ticking time bomb memo, which is being misread here, and I can read to you, has to do with an amendment later in the 90s that said the amount is set of the offset, but it can be reduced, not increased. It's never increased. It can be reduced for those people who retire early. And so what the ticking time bomb memo says in 96 is they realize that because the offset could be reduced if people retired early, there was a ticking time bomb. It encouraged their employees to retire earlier. And I would ask that the court go back and look at that memo because that's exactly the way it's read. It's not a ticking time bomb because the amount is increasing and going to eat away. The amount is set in 1985, set for microwave, set for ESL. It's just the problem with ESL is nobody filled out the numbers on Appendix J. Or disclosed them. Well, they did disclose that because they didn't disclose each individual one. No, they didn't. In one time, but they did disclose, and nor did they for microwave, and nor has there ever been a claim that the numbers that were in Appendix J needed to be disclosed. Nor would I submit is the law in the Ninth Circuit require that. The reason it's very difficult is because people were receiving individual letters that are in the record, and we have read the record carefully, sir. I don't want you to think we haven't read the record. We have read it carefully, and so this is your opportunity to tell us what we're missing. But there are individual letters, not examples plan-wide, individual letters that folks receive saying you can expect at age 55 or 65 to receive this amount. Judge Kristen, there are DVR notices, and I'm going to come to those because you asked some questions about those and how to explain them, and they're very good questions. I'll walk through them for you. But more importantly, let's take the plaintiff in this lawsuit. There's a letter that he gets in 2009. I'm sorry. My confusion of papers doesn't have the reference there. In 2009, he gets a letter that says here's what you're going to get. Here's what the ESL offset that applies to you is. He gets that in 2009. No dispute that he gets that. DVR notices went to lots of people. It was the regular practice to send them, and those DVR notices told them. Now, you asked about specifically, who was it, Mr. I'm sorry. I'm trying to figure out how these put folks on notice. Let's take Mr. Roberts, whom you asked about. I started to say. I'm sorry? What I started to say is that if there's one thing ERISA requires, it's that folks are supposed to know where they stand in their plans. And I'm trying to figure out how these notices put individual pensioners on notice. So we were looking at ER 1004 to Mr. Roberts. What ERISA requires under the law of this court and the law of the U.S. is to put people on notice of things that can happen. It does not require individual notice of all the circumstances. Fires don't tire and rubber. ERISA disclosure provisions ensure that the individual plan participant knows exactly where he stands with respect to the plan. I didn't make it up, sir. It's right here. In this install and in other cases decided by this court, there's no requirement to give the exact amounts that are going to happen. There's an amount to tell them. No argument. I'm just trying to figure out how these particular examples that are in the record put regular folks on notice. And this is your opportunity to tell me what I'm missing. So, Justice Christian, let's take Mr. Roberts for a second. That's a good idea. That's the one I've called your attention to, and it would be really helpful for me to hear what you have to say. So, Mr. Roberts, if you turn to ER 10012, on April 19, 1992. Wait a minute. Let me just turn to it. I want to make sure I understand your answer. Okay. I'm there. So, on that day, he writes that he knows about the ESL offset. He writes and says, I was employed by TRW, the amount of this offset varied from time to time, and the last time I was given a figure, it was computed incorrectly for the formula given. So he knows that there is an offset. He says no amount is stated for the offset for the ESL account balance distribution. We're going to come to that. You skipped that sentence. Oh, I'm sorry. But my point of that letter is he clearly knows about the offset. He knows there is an offset coming. If you turn to the letter. But is that enough just to know generically that there's an offset? Don't you have to, under ERISA, don't you have to be told accurately what that is going to be? No, you do not. And that is the whole thing. He can be told inaccurately and that follows ERISA? It seems like a textbook example of not following ERISA. He's not being told inaccurately. He's being told that there's an ESL offset. That's what he needs to be told. That's the holding of Stahl and Allen and other cases. He needs to be told that there's an ESL offset that's going to be calculated and that will be applied. He does not have a right to be told the precise amount of it. Does he have a right to be told if he's one of these cases that, you know, it's likely that that's going to outrun your pension from the current plan so you'll get nothing? Does he require to be told that if that's the case? He was told that. He was told that it was possible that he might get nothing. They all were. That's the SPD disclosure in 1985. Everyone who this is subject to, because it's only those people who were employed in 1985 that it's subject to, and every one of them were told there's going to be an offset from this plan and it may do away with any amount that you're going to get in the future. So this letter going back to ER1012, which you called our attention to, which is very helpful, he says no amount is stated for the offset. He explains that it's been computed differently and incorrectly. I cannot consider the data to be correct. So I'm not sure what else he's supposed to do. He said, I don't know what the amount is. And what's the record show, sir, about a response to this? The letter that you have pointed out, Your Honor, where he says to demonstrate how it affects your ultimate retirement benefit, I've enclosed in extant worksheets and detailed calculations worksheets for retirement at ages 55 and 65. Because remember, as I said, Excuse me. Forgive me for interrupting, but now you're reading from something else. So is that? Oh, I'm sorry. That is ER1004. Okay. Okay. I'll go back to that. That's the letter that's in response to his inquiry. Oh, they're just out of order in here. Right. Okay. And so, great. Okay. So now we're back to ER1004, and I'm reading this, and I'm going to understand what from this if I were Mr. Roberts. Mr. Roberts is being told, we got your letter. Here is the balance worksheet. Now, remember, as I said, the maximum of the offset is the one that's determined as a retirement age of 65. That's the one that was supposed to be in Appendix J, and the one that was in Appendix J for the other employees, the microwave employees. The ones who are not at issue here. No, I understand, but it says something, Your Honor, that they're treated exactly the same way. But they weren't, because one set got information and one set did not. No, no. In fact, the ESL microwave employees never got Appendix J. That was never disclosed. That's my point. You're saying they're similarly situated to another group who got an Appendix J. They didn't. I'm sorry. I don't mean to interrupt, but they never got the Appendix J. It was just prepared, but it wasn't disclosed to them. Exactly. It was never disclosed. I'm not sure this is a proud moment for your client. How does this help you? Because we're just trying to figure out whether. The experts testified this was the industry standard. Their expert agreed with our expert. Could it be that the industry standard violated ERISA? Because industry standard is not the statutory requirement. The industry standard, the statutory requirements inform the industry standard. These are people who do this for a living. They handle lots of these cases. There is no requirement that the individual. You're supposed to be talking to people who don't do it for a living. So can you explain how this disclosure that he received in response to his letter would have put him on a. Happily, Your Honor. And so we turn two pages in. These are the worksheets that were referred to in the letter. It makes a difference if it's 55 or 65 because the offset's less than 55. And then if you look on that pension plan, it says three, prior plan benefit. You want me to be on ER 1007? Yes, ma'am. Okay. I'm sorry. That's all right. And then it goes on and it does the math and it shows prior plan benefit. And then it says TRW benefit after offset. And if you do the math, it shows that's the amount that's being subtracted. Not only that. Wait, wait, wait. On the bottom of 1007, prior plan formula. That's where you want us? Prior plan benefit, number three at the top. That's under prior plan formula. There's the January 1 plan formula and then there's prior plan formula. Correct. All right. Number three, prior plan benefit. Yes. PPPBIN$CONFACT. What's that? That's the calculation of his benefit. Okay. So what's the .4810 factor? My recollection is that I believe is the mortality factor. My point is I understand, Your Honor, that this doesn't explain what each of the detailed numbers. But there's no requirement to. You just told us a minute ago. I can't understand it. You can't understand it. And you just told me a minute ago, in all fairness, that the numbers were disclosed and they could have done the calculations. No. What I told you is that the ESL offset was exposed. They knew they had an offset. They knew they had, and this tells you the amount of it. Okay. Tell me again. What he's put you on notice of earlier in this letter that they're responding to is that it had been calculated incorrectly and he had trouble getting incorrect calculations, and he was asking her, tell me how to calculate it. And so it's terrific that he's writing that and they're giving him an authoritative calculation of it. But neither you nor I can understand it. Well, I'm sure that if I got on the phone with the administrator, I would. I mean, look. But that's the whole point. This person asked the administrator for an explanation in plain English that an ordinary worker could understand, and this isn't it. I mean, you're dealing with people up here who've also had other ERISA cases, and we've looked at documents of this kind, and these are less comprehensible than many. Could I ask you a follow-up question? Yes. At this point, and feel free to correct me if I'm wrong, because I don't do this for a living. I do a lot of ERISA work, but I haven't seen one like this. At this point, when Janice Rupina was writing her letter at ER 1004 in response to Mr. Roberts on this date, were there any unknowns here other than what date this individual is going to retire? No unknowns other than the date that this individual is going to retire. They knew they were going to use the 8.5% interest rate? They knew they were going to use the 8.5% interest rate. Does 8.5% appearóand this is truly a sincere questionóis it on here? The 8.5% interest is, yes, calculated in these figures. Well, it's baked in, but can youódoes it tell me anyway? It is baked into these figures. It doesn't appear on here as 8.5% interest. But the law is on this, againó Can IóI wasn't quite done. I'm sorry. That's all right. I keep interrupting, but I really am trying to get there. Okay. So my question isóbecause I don't think there would be any variables that were unknown at this time, and this guy isóthis individual is askingó Other than the date of retirement. Sure. Sure. That's always a variable, but this could be calculated to say, you know, if you're going to retire at 55, if you're going to retire at 65, which seems to be the standard in these responses, you know, understandably so. Was there anything that prevented the plan administrator from telling him what amount he could expect to receive on this date? The plan administrator did that regularly. Okay. So we have a bunch of those letters, too, telling people you can expect to receiveóyou've seen themó$966 or whatever. They're individual, and they're very specific amounts. People would call up. They would request those. I think there was a limit on the number you could request, like one every six months or so. Well, why didn't they tell them the numberó I really don't understand how it's possible they didn't just tell them. They also didn't tell them how to perform the actuarial equivalent using the mortality table. That's not answering my question. Why didn't they just tell them the amount? In fact, it's worse because they represented you would receive a certain amount, and they knewóit seems to meóthis isn't truly an opportunity for you to tell me what I'm missingó they represented they were going to receive a certain amount at a time when they had all the variables to know that they weren't. The DVR notices that they went out were accurate. The DVR notices that they called in aboutó people would give them an assumption. They would say, I want to retire in 2010. What would that do? They'd send it back. They didn't give them the calculation. They didn't give them the interest rate. Allen v. Honeywell, McCarthy, Bradstreet, lots of cases hold you don't need to give the interest rate out. Okay, but what aboutóhere's what's bothering me, because like Judge Tashima and Judge Graber, we've seen a lot of cases. I have not seen one like this, sir. But have you seen one that gives an interest rate? I don't worry about the interest rate. What I worry about is in this particular case, they're affirmatively representing you can expect to receive a number that they must have known these folks weren't going to receive. No, ma'am, that's not true. Why not? Because the record shows that when these people inquired, they gave them the assumption. They said, I'm going to retire as of this date. I'm going to retire that date. They would do different iterations, and they would get back the numbers that were calculated that reflected what the retirement benefit would be as of the date required. Beleha got one in 2009, which is frankly the end of the statute of limitations claim for him if it weren't already over from 1985. But theó So yourólet me just get this straight. Your response is that this claim was correctly dismissed at summary judgment because no one could decide that this wasóthere was a failure to disclose here? That's right. Okay. There are no misrepresentations that are pointed to. And at the very beginning, at the very outset, the SPD that went out said, you know, there's going to be this offset. Here's what's going to happen. It may wipe out your savings. And you know what? It went to two sets of people affected by this. The ESL people for whom there was no Exhibit J, but the Exhibit J amounts were never disclosed to anyone. And the microwave people for whom there was an Exhibit J, those Exhibit J amounts are likewise never disclosed to people. Those amounts were set in 1985. There's an amendment in the 90s that says we're going to reduce the offset if you retire early. That's the reason for the ticking time bomb memo becauseó I read the ticking time bomb memo. Yeah. TRW was concerned that people were going to leave early because of it. Yes, because if they'd understood, they might. Well, they might. Well, it made that very rational decision. But it's not as if there was an 8.5% interest rate that is going on and on and on. 8.5% interest rate was picked in 1985. It was an entirely fair interest rate to pick. And, in fact, courts in this circuit, at the same time, in the Xerox case, independently picked 8.5% to be theó Well, in a sense, it doesn't matter if it was fair if it's disclosed because ERISA does not contain a substantive requirement that would affect the interest rate picked. But it does require that people be told and that they are told in a way that they can comprehend what it means and what effect it has on them. And I would think that almost all these employees would have left a long time before they did if they had actually understood the absence of a pension that was coming to them and gone to work for someone who would pay them a pension for the work that they did. The 8.5% was only used at the outset to determine the age 65 actuarial value. And it was a fair interest rate to pick at the time. It was a medium interest rate to pick at the time. And it was the way that people picked interest rates at the time. The long-term interest rates were much higher at the time. I'm notó But, counsel, I think you're arguing a point that Judge Graber is not making. Okay. She said, in a sense, it doesn't matter as long as it's disclosed. I'm not aware of any case in this circuit that has ever held that you need to disclose the interest rates. I am aware that the general requirement is that you put people on notice of things that can affect their rights. And this is an example where they were put on notice that there was an offset that would apply based on the thousands of dollars that they received when this plan was converted from a defined contribution to a defined benefit plan in 1985. And I believe that if you lookóI understand the frustration with notó Why didn't we tell them exactlyó? Well, we did. They would write, and we would tell them what it was. The record is replete with instances of that. But what we're talking about here is the failure to disclose an ESL offset that was disclosed, and its effect wasóits potential effect was disclosed. There are some people that did better because of the pension plan and the fact that they got service credit. There are some people who did worse. If you rewrite this plan in order to do away with the offset, then there are people whoó but also to change the terms of the fact that there'só you're going to give service credit to people who've already worked there, then nearly half the class suffers. So I understand that your point is a disclosure point. I don't think that the case law in the Ninth Circuit, or otherwise, requires the details of disclosure that you're saying. All that it requires is that people be put on notice of events that can affect them. They were put on notice, and they were told that this could wipe out your pension. I submit to you that's all the law requires. Judge Graber asked a couple of questions that you haven't had a chance to respond to. I'm happy to try. One of her questions was whether you're interested in mediating this case or whether your client would be willing to do so. I haven't talked to my client about that, but I know that I would always recommend mediation of any case. Fair enough. You also asked whether we should reach the merits, and opposing counsel was given an opportunity to answer that question, but you have not. Reach the merits. I'm sorry. Let me make sure. The question that I asked opposing counsel was that if we were to conclude that the action was filed within the statute of limitations, whether this court can reach the merits because the issue has been briefed on liability. I don't think there's a problem with reaching the merits on liability. I think that the merits really have to do with whether the disclosures were accurate, and I submit to you the disclosures were accurate. I don't know that we've let Judge Toshima get in a word as well, so let me just check. Does he have additional questions? No. Additional questions? No, thank you. Were you able to finish all of your thoughts in spite of my persistent interruptions? I've got way too many thoughts to try to bother you with all of them, Your Honor, but thank you for the opportunity to, and I'm happy to try to answer any more questions. We appreciate your patience. We'll hear from opposing counsel, and thank you, counsel, for your argument. Thank you. Thank you, Your Honor. I want to talk about what was actually disclosed, because I think opposing counsel has paraphrased a couple of times what was supposedly in the 1985 summary plan description, which is the longest description of the plan transition that the plaintiffs ever got, and I believe I heard counsel use the term that it was disclosed that it could wipe out their pension. I just want to be clear that there is no language, anything like that, in the summary plan description that was issued in 1985. That's in the record at ER 758. The sentence that talks about the offset says the monthly pension benefit, which could be provided to you at age 65 by the terminated plan's account balance, will offset, serve to reduce the amount produced by the plan's normal retirement benefit formula. Then they change language to say if the annuity value of the account balance exceeds the amount produced by the plan's formula, there will be no further benefit from the plan. That is not a disclosure of the nature and scope of an offset that could wipe out the benefits that you would earn beginning after the plan transition. It is jargon. What page of the plan? I have a different copy that doesn't have the ER on it. So what page of the plan itself are you looking at? I'm actually looking at the summary plan description, which is the second page of that. I'm looking at the version that's at ER 757 to 758. Could I get you to change gears? At least at some point. I would like to hear from you what your best argument is that this was concealed as opposed to to disclose. Yes, Your Honor. If I could briefly finish about the summary plan description. The examples begin at ER 762 to 763, and I just want to be clear that these offset compounded the failure to disclose its impact because not one is more than 25% of the pension, and they are paired with account balances in conclusory terms that just say things like if you got a $4,800 payout, the offset is $60. If you got a $7,200 payout, the offset is $90. There's no instruction on how it's calculated, no mention of the interest rate. So anyone looking at these, including the plaintiffs who testified at trial, would have absolutely no idea of how their offsets were actually going to be calculated to be much, much higher and wipe out their pension benefits. On concealment, we have a number of arguments for why this went beyond simply a breach, but a breach that was actively concealed. Again, they had a duty to disclose. Every time they issued a summary plan description, they had a duty to disclose. It's clear from the record that they knew what was going on, that they knew that the offset was eviscerating people's pension benefits, and they continued to minimize it after having that knowledge, even after changing the plan for their current employees. That is an act of affirmative concealment. There are multiple instances in the record, including two plaintiffs who testified at trial, Mr. Harmon and Mr. Beleha, who were told what their pension benefits would be in person, were later given communications. Mr. Beleha's is also in the record from 2015, affirmatively misrepresenting the amounts. I believe opposing counsel referenced the notice he received in 2009. He testified at trial that he got that, and he called, and they could not explain it to him. The person on the phone said she didn't have the information, and he should check back closer to retirement. He does that? Excuse me. Is that deposition testimony or trial testimony? I believe that is trial testimony, Your Honor. Okay. And so, you know, that's a check's back closer to retirement in 2015, and he gets told again that he's going to get $1,000, which is what he was told when he left years earlier. We have other, again, the record is replete, but the communications to the class members were not clear, and Your Honor focused on the example of Mr. Roberts, who had to write back to ask for a calculation of an offset, and even then it was not clearly provided. And we have the fact that Northrop never disclosed that it never created Appendix J in the first place, which itself was a breach, and it was simply covered up by amending the plan to take out the reference to it. Well, how could you show that that caused any damage? It sounds like they didn't create it, but they weren't going to disclose it anyway. As to the other group, they didn't disclose it anyway. The representation that the appendix was not disclosed to the other group is something that I'm pausing over. Plan members have a right to receive a copy of the plan, and for an Appendix J, it's actually in the supplemental excerpts that defendants put in the record before this court. Appendix J is part of the 1985 plan. It only lists the microwave employees. Your contention is that the record, if I can interrupt again, I'm sorry, but your contention is that the record shows that Appendix J was created and was disclosed to other members of the plan, just not to ESL? Well, our position is that there was certainly a version created that listed the microwave version, and, again, it's in the version that defendants put in their supplemental excerpts. The question is whether it was disclosed, and your response, I think, is that they're entitled to a complete plan. Is that your response? Sorry to not get to that quicker. Right, they would have been entitled to ask for it. What those plaintiffs were doing, or what the microwave employees were doing, isn't really part of the record of this case. So, again, I just would like to conclude by saying that there's really, there's simply no serious question here that the disclosures that Northrop made did not satisfy a RISA standard. These employees, and those standards have a purpose. The purpose is to allow employees to make good decisions about their employment and to plan for their retirement. And the lack of information that these class members had made it impossible for them to do either. Multiple plaintiffs testified at trial that they ended up working longer in their 60s than they intended to because they were misinformed about their pension benefits. I'm going to stop you there because you're significantly over time at this point. That's all right. We've taken you both over time, and we appreciate your patience very much. It's an important case. It's an intricate record, and so we struggled to make sure that we really understand it, and your questions were very helpful, as was your advocacy. So thank you for that. We'll take this under advisement and stand in recess. Thank you, Your Honor. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart. The court for this session stands adjourned.
judges: TASHIMA, GRABER, CHRISTEN